Pages 1 - 36

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN

JOAO CONTROL AND MONITORING              )
SYSTEMS OF CALIFORNIA, LLC,              )
                                         )
            Plaintiff,                   )
                                         )
  VS.                                    ) NO. C 11-6277 EMC
                                         )
SLING MEDIA, INC., et al,                )
                                         )  San Francisco, California
            Defendants.                  )  Friday
                                         )  July 6, 2012
_____)  2:30 p.m.


**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff:**          WHITEFIELD, INC.
                            9800 D Topanga Canyon Boulevard
                            No. 347
                            Chatsworth, California 91311
                        BY: **STEVEN RITCHESON, ESQ.**



**For Defendants:**         MORRISON AND FOERSTER LLP
                            425 Market Street
                            San Francisco, California 94105
                        BY: **RACHEL KREVANS, ESQ.**




*Reported By:    Debra L. Pas, CSR 11916, CRR, RMR, RPR*
                *Official Reporter - US District Court*
                *Computerized Transcription By Eclipse*

P R O C E E D I N G S

**JULY 6, 2012**                                          **2:48 p.m.**

**THE CLERK:**  Calling Case C11-6277, Joao Control versus Sling Media.

Counsel, please come to the podium.

**MR. RITCHESON:**  Good afternoon, your Honor Steven Ritcheson appearing on behalf of the plaintiff.

**THE COURT:**  All right.  Thank you, Mr. Ritcheson.

**MS. KREVANS:**  Good afternoon, your Honor.  Rachel Krevans from Morrison and Foerster for defendant Sling.

**THE COURT:**  Good afternoon, Ms. Krevans.

The answer with respect to the scope of the vicarious liability doctrine seems to be less than crystal clear, it seems to me.  On the one hand, I understand why that doctrine should be interpreted in a way so as not to undermine the requisites of the indirect liability doctrine, which sets forth certain bars and requirements and to allow circumvention that would -- could render those pretty ineffective.

On the other hand, it's not clear to me that just because a third party that engages in -- engages the last use on, let's say, the third device here or the communications device is not an agent or contractually obligated at its legal risk to do so. To say that that -- if you require it too narrowly, that suggests almost a per se rule.

It's hard to imagine whenever you have an end user and a

manufacturer distributor and the end user supplies that last piece, when would there ever be a situation when that -- you could find sufficient direction or control within the meaning of *Centillion*, *BMC*, now vacated, that would be satisfied. Because the end user could always say, "I want to do it.  I have to do it."

MS. KREVANS:  Well, your Honor, I think what you've pointed out is exactly the state of affairs that the law puts us in, but the answer is not that this Court should do something different than what the Federal Circuit has said the law is.

The answer is that this may just be a situation, as has happened before, including in those cases, where a plaintiff has not written its claims in a manner that they can prove infringement, at least by the party that they have chosen to sue.

So what the cases say is, there is sort of the original doctrine of you could be vicariously liable for infringement that you didn't do if the act that you didn't do or maybe the portions of the act that you didn't do were done by your agent or someone standing in the position of your agent.  And the thing that cases like *Centillion* and *Acmoy (phonetic spelling)* to that is you don't have to have somebody who meets the definition of agent in a strict since.

If I can remember law school, I think I learned at one

point what the requirements are for saying when someone is an agent of another person, and there are strict requirements. And there are cases like *Centillion* in the negative and *Acmoy* also that say it could also be a contractual obligation.  It could make you vicariously liable.  So it broadens that agency standard somewhat, but it still has to be an obligation.

What *Centillion* then goes on to say is someone merely being your customer does not give them a contractual obligation to do things at your direction.  So that can't substitute for the agency's relationship that would otherwise be required.

**THE COURT:**  It's interesting that in *Centillion*, for instance, the Court pointed out that Qwest in no way directs its customer to perform nor do its customers act as an agent. There is no real direction there.

Same thing in *BMC*.  There was an absence of any evidence that Payment Tick also provides instruction instructions or directions regarding the use of those data.

In contrast -- and there was utility to the product that was being used in *Centillion* without the downloading or the consumer utilizing this extra feature.  Whereas, here there is no utility -- when you buy a Sling Box, you get nothing from it unless you download the -- your smartphone or your tablet or whatever you're using, unless the Sling player -- I guess that's what it's called -- the software download into it has no utility at all.

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

So, is there a difference between -- you know, one could say that there is more direction and control when you hold the keys to manufacturing saying you can't even use this thing unless you download it and use it in a way that we're prescribing versus somebody that would say, well, here is an array of things.  If you want to download this, it's up to you.

MS. KREVANS:  There is not, your Honor.  Under the case law that they have to look at in order to say even though our customers are not our agents, we can still be vicariously liable because that case law doesn't say it's anything, agency or anything else.  The case law says in addition to agency, it could be a contractual obligation.  Doesn't have to being a contract that makes you my agent, but if you have a contractual obligation to me, the defendant, to perform the infringing acts, that could also be good enough.  If you look at the --

THE COURT:  When could there ever be a contractual obligation by the end user?  If your analysis, which is really more in line with the Acmoy --

MS. KREVANS:  We're *Centillion*, your Honor.

THE COURT:  Well, *Centillion* doesn't -- isn't quite as explicit, I think, as Acmoy.  But in any event, however, your -- under your construction could there ever be vicarious liability as a result of end user involvement?

MS. KREVANS:  There could be, your Honor, but not in a situation like this where the end users are simply customers.

There is no real contract.  The thing that they are alleging is the contract is the customer establishes an account with Sling, but that account doesn't obligate the customer to do something.

This contractual obligation which is supposed to substitute -- and I think it's important to remember this.  This is a slight broadening of the agency rule.  If someone is the agent of the defendant, the defendant cannot escape infringement by saying, "That person did it, not me."  Because that was the defendant's agent.

These cases establish there is a broadening, but not a very big broadening, of the agency rule where rather than strictly being an agent, that third party is being appointed to as doing some or all the infringing act is contractually obligated to the defendant, so the defendant has the right to require him to perform the acts.

THE COURT:  Can you imagine a situation where the end user of the accused product or method would be contractually obligated?

MS. KREVANS:  Yes, but it wouldn't be a situation like this one, your Honor, where there are simply consumer electronics.

THE COURT:  What would the example be?

MS. KREVANS:  Let's say you had a -- let's say the claims were to a process for manufacturing a drug and the main defendant was a large pharmaceutical company.  I'll call them

Pharmaco, so I won't use any real names.  So Pharmaco is accused of infringing manufacturing process for making a drug and they say:  We don't do it because we only do the first part and Company X in China does the rest.

Well, it turns out that Company X is Pharmaco's contract manufacturer.  They have a contract with Pharmaco that obligates them to take the materials supplied to them by Pharmaco.  Pharmaco has done the first three steps in the process.  Company X in China does the last three.  This really happens.  There was a contract manufacturer of drugs in China. They have a contract with Pharmaco and the contract says, here is the specifications --

THE COURT:  That's not a consumer end user.

MS. KREVANS:  That's right.  Well, it's not a consumer.  It's not Pharmaco's agent, but Pharmaco has contracted out the last three steps of the process, so Pharmaco is liable.

THE COURT:  I understand that.

MS. KREVANS:  That's what this is about.

THE COURT:  Well, I'm asking you:  Can you imagine a situation where a consumer end user -- is there a per se rule? Under your rule without an agency or contractual obligation, that would seem to exclude any reliance of vicarious liability based on a consumer end user.  Because I can't imagine where a consumer end user would be contractually obligated to do

something.

MS. KREVANS:  They would not be, your Honor.  And that's why this theory -- as we said to you when we were here on the first motion to dismiss, this theory cannot work as a matter of law.

Based on the allegations that they said in their briefing last time they would put in their complaint, which they did put in their complaint and which, if you look at their complaint, they first say Sling directly infringes.  That's clearly not the case, but they say it.  And they say but if not, Sling vicariously infringes because it's responsible for the acts of its customers.  It is vicariously liable for them.

They cannot make that allegation stick as a matter of law because although these cases do somewhat broaden the agency rule, they don't broaden it very much.  It's only if there is a contractual obligation to the defendant --

THE COURT:  So, let's explore the limits of your logic.  What if Sling provided more than Sling player software?  They actually provided some hand-held tablet or something that's not preloaded.  And they got instructions:  Use this.  All you've got to do is slip the disc in and voila, it's all there.

MS. KREVANS:  So, you mean, we made the whole thing but we purposely broke it into two so it didn't look like an infringer manufactured it and it was just a sham to avoid --

**THE COURT:** Well, it's still up to the volition of the consumer to combine the last two ingredients, i.e., software and hardware, to make the third control device work.

**MS. KREVANS:** Well, I would say actually under Supreme Court case law that would still present a tough question, but it's quite different from the facts here where we don't make the other device. The other device could be any one of hundreds or thousands of products on the market.

**THE COURT:** Why would it be a tough question? The consumer is not legally obligated under your construct to load this software into and turn it on and actually employ the system.

**MS. KREVANS:** I think the reason it would be a closer question than what we have here is because the plaintiff could make the allegation that you really had made the whole thing and had artificially divided it solely for the purpose of creating the illusion --

**THE COURT:** It was a sham doctrine or is some kind of thing?

**MS. KREVANS:** There was that kind of a sham, because you really made the whole device, and you sold the device. You provided the consumer with everything and you really were just kind of creating this delusion that you weren't doing this.

That's clearly not the facts here. And the device here, which we don't make, is one of thousands of different mobile

devices on the market.

THE COURT:  Mr. Ritcheson, what about this?  Isn't this doctrine of vicarious liability just a slight expansion of agency?  The whole idea is not to be able to circumvent or evade liability by saying:  Well, I'm going to have this manufacturer over here to do final product.  It's not meant to expand into the area of inducement or contributory infringement, which is already covered by doctrine.

MR. RITCHESON:  I think what this is intending to do from a fundamentalist to do the right thing and not to have a situation where a manufacturer can split things up into small parts and cloth it under the guise of individual choice, because I think your initial instinct was right; that this goes to the point of direction.  And direction, when we look at this line of cases, we're looking at influence that is in what manner, what is the dialogue, the discussion or the monologue that's occurring between Sling and its customers when it's directing it to use a device, a solution, that they have a nice name for it --

THE COURT:  But not legally requiring.

MR. RITCHESON:  It's required for the use of the device.

THE COURT:  But not legally requiring.  They could walk away without any legal consequence.

MR. RITCHESON:  There are a number of issues that

we're sweeping here that I'm a little bit concerned with, which is some of the merits, some of the facts we're assuming or guessing and we don't know.

The fundamental question on the motion to dismiss is:  Can we go ahead and find out about that relationship?  Can we inquire into those directions?  Can we examine the company on its -- its marketing policies, its instructions, what the results of --

**THE COURT:**  I think Ms. Krevans' argument is even if there are very clear instructions, you must -- when you buy this, you must do this, you must do XYZ, you have to download it, you have to communicate, otherwise zilch, you get nothing. You've wasted your however many hundreds of dollars this cost. That still doesn't get it because they are not -- the end user is not really obligated as an agent or contractually in a way that the manufacturer -- co-manufacturer in China would be.

**MR. RITCHESON:**  Well, we're now adding, bolting things onto *Centillion* that's not there.

I understand Ms. Krevans' extension or desire to extend the law very well.  It's just not where the law is right now.

What we have is absolutely is -- the instruction is -- we're not limited to a relationship that is simply one of agent.  We're looking at these questions of control.  We're looking at these questions of direction.

And ultimately what we're trying to do, I think, is to

find that bridge between the obviously infringing conduct and perhaps the inability to get to indirect infringement.

So I truly believe that we have pled sufficient facts to be able to get into discovery and learn what really is the case and not work on assumptions.

THE COURT:  Well, but under 12(b)(6) motion you can assume all your facts are true, draw all the inferences in your favor and the question is:  Given the law as it's articulated or as one can discern doesn't cut the mustard at this point.

MR. RITCHESON:  Well, if we look at the second amended complaint -- and there is one thing I do agree on, that at a minimum -- I've only begun recently re-involved with the case, but I've looked at it and I've concluded at a minimum there is a housekeeping amendment that needs to happen to this complaint.

I think some of the points that Ms. Krevans made with respect to indirect infringement do need to be addressed.  I'm not particularly impressed with the second amended complaint either.

THE COURT:  You're not impressed with the fact that there is no specific claim for indirect.

MR. RITCHESON:  That was distinctly unimpressive, your Honor, and I would like to discuss that.

But if we look at the claims as they sit now, the allegation is at the end of Paragraph 10, for example, that

there is -- they are liable under the theory of direct infringement, either literally or under the doctrine of equivalence, because it directs or controls the Sling customer to infringe the patent.  In this case the '130 patent.

Additional facts and allegations that amplify on that are contained in the following Paragraph 11.  And those similar allegations are made with respect to the '046 patent, which is a second patent-in-suit, in Claims 12 and 13.

**THE COURT:**  But what's not alleged is that the consumer has a legal contractual obligation to do so at some legal risk if it doesn't.

**MR. RITCHESON:**  Sure.

**THE COURT:**  The instructions -- one can infer from the instructions you must do this or make certain you've got X, Y and Z.

**MR. RITCHESON:**  Well, we know there is a contractual relationship.  That isn't disputed.  What's disputed is the nature and extent of it.

When we are getting to that sort of level of granularity, that sort of level of diving in --

**THE COURT:**  It's not plausible to think that a customer can be sued if it doesn't use what it paid for.

**MR. RITCHESON:**  Certainly not, but there could be consequences.  You know, for example, a loss of certain rights or, you know, to use of the system if they don't deploy

particular software within a certain period of time or provide or obtain updates timely. Things of this nature where you're really looking at how involved is Sling with their customer and is that relationship sufficiently close that even though we don't need to reach the agency standard, are you seeing that same type of influence in this conduct?

And that's the issue that I think requires, frankly, some discovery and some exploration because these facts are in the particular possession of Sling.

**MS. KREVANS:** Your Honor, may I address this?

**THE COURT:** Yes. And I would like you to address my question as to why is -- the *BMC* and *Centillion* Courts went into an observation about the lack of instruction or directions when all it had to say is, "No legal obligation. These were the end users." End of case.

**MS. KREVANS:** Okay. Let me take the two points separately. So, the second one first about what the law actually requires.

If you look at both *BMC* and *Centillion* -- and I have *Centillion* in front of us, so that's the easier one for me to start with -- what it says is there could be vicarious liability if there is an agency relationship or other contractual obligation to perform the steps.

It says -- this is, Centillion in Section 2 "Use by Qwest." I think I'm at page -- what page am I at here? It's

numbered Section 7 of the opinion.

It says:

"Vicarious liability arises when one party controls or directs the action of another to one or more steps of the method," citing *BMC*.

"We confirm this approach for method claims recently at mini auction and recently explained in Acmoy that for infringement to be found when more than one party performs steps of a method claim, an agency relationship or other contractual obligation to perform the steps must exist."

So this is telling us here, very specifically, what kind of contract it has to be.

Now, this is repeated multiple times in the further discussion in *Centillion*, including in the subsequent section where they talk about an alternate way that had been pled in *Centillion* for liability for making under 271(a).

Centillion argued they also had a path to an infringement claim there and the Court said no, because Centillion didn't make all the parts and, further, they were not vicariously liable for the actions of it's customers, as discussed above. And this is a summary by the *Centillion* Court of their holding.

"Qwest's customers do not act as Qwest's

agent as a matter of law, nor are they contractually obligated by Qwest to act."

**THE COURT:**  And I'm focusing on the other sentence.

"Qwest in no way directs its customers to perform."

Suggesting if they did direct them, even though there is no contractually --

**MS. KREVANS:**  I think, your Honor, there is really no way to read the *Centillion* opinion or *Acmoy* or *BMC* in their entirety, at least the sections in them about this issue, and come to any conclusion other than the fact that what direct means there is Party A has the right to tell Party B what to do and Party B has to comply.  That's what the contractual obligation here refers to.

And I think what Mr. Ritcheson is trying to do here with respect to his argument is confuse the law of vicarious liability under the agency or contractual obligation group, which is what they have tried to plead and which we say they cannot plead in this circumstance with induced infringement where a customer buys a product from a manufacturer and it comes with an instruction or manual or directions on a website that says:  Here is how to use it.

And the plaintiff's infringement allegation is if you follow their step-by-step, then the customer ends up infringing and then infringing was induced by the step-by-step

instructions given by the manufacturer.  That's a different kind of direction.  It's not contractual obligation.  It's inducement --

THE COURT:  And you would cite *BMC*'s language:

"Expanding the rules governing direct infringement to reach independent conduct multiple factors would subvert the statutory scheme..."

MS. KREVANS:  That's exactly where I was about to go, your Honor.  In fact, *BMC* -- the only thing *BMC* really adds here is that it explicitly cautions against mixing up these two documents.

They haven't -- now I have to say in their brief, their opposition brief, they try to pretend that they actually did mean after all to plead every kind of infringement in the second amended complaint and they have got this laundry list of things that they can point only to their prayer of relief for.

This is -- I find myself in the exact same position I was when we were at the first motion to dismiss.  This is about what was pled, not what's in the brief.

Last time in the brief they made an argument that was basically the vicarious liability contractual obligation argument.  They said that in the brief.  It wasn't in their first amended complaint and I said that it should be dismissed because it's not in the complaint.  They say, we could amend to

put it in.  They now have amended to put it in.  It doesn't work because our customers don't have a contractual obligation to us.

Now, in their opposition brief they say, oh, but really, it's every kind of infringement that we've pled.  It's inducement.  It's contributory.  It's all those other things.

And I should say, just because I do want to address, I said, two things.  The other was where I think that Mr. Ritcheson, again with respect, went a little bit into the realm of fantasy, is this notion that with discovery they are going to find that our customers are contractually obligated to Sling; that they must use the box; that they must perform the steps; that somehow they -- we have a right to force them to do so.

He knows very well that that's not the case.  He knows that's not what he expects to find in discovery.  And I should say all of this information is, of course, publicly available and one would think and, in fact, I know that they have looked at the website and looked at what we tell our customers they can do with the products because they used that information in their opposition brief when they were trying to fight the dismissal of the first amended complaint.

There is no contractual obligation.  This is exactly the circumstances that *Centillion* says does not work for vicarious liability.  And I don't think we need to go around this again

for a fourth time, which is what he's now asking for permission to do.

MR. RITCHESON:  Your Honor ---

THE COURT:  Last word and then I want to talk about direct infringement.

MR. RITCHESON:  Ms. Krevans has a wonderful way of stabbing me in the back while looking at me.  She is quite adept that way.

I am not confusing anything.  I'm trying to simply get to the core of the issue here, which is:  Is it fair at this juncture, based on what's before you, to write off this claim; which is what she's asking you to do, is to summarily adjudicate this claim.

THE COURT:  And to be blunt, the answer turns on the legal question.

MR. RITCHESON:  I understand completely.

THE COURT:  I'm going to look at it through the lense of the most restrictive language, which is you have got to have contractual obligation of an agency or some more amorphous broader notion of direction, almost encouragement or direction by virtue of instructions and empowerment to the end user.

MR. RITCHESON:  But we're saying that the use of these broader principles is more consistent with what *Centillion* was doing, which was broadening, in fact, the reach of the doctrine.

And if you look at the language from *BMC*, the passage that Ms. Krevans so vehemently agreed with you on focuses on the independent act.  You're looking at things like true independence.  You're looking at things like the influence of the manufacturer on the customer.  You're looking at this concept of the lack of instruction or direction.

These are key principles that would be swept out by Ms. Krevans, if she would let you, but these are fundamental, core issues --

**THE COURT:**  Swept out of this maybe, but not out of the indirect infringement arena.

**MR. RITCHESON:**  No.  I acknowledge, and as we get into that I think that ultimately there will be an opportunity for us to address this in the indirect infringement, but I feel very strongly that this is exactly the sort of conduct as pled that deserves to have discovery and a ruling on the merits; not on what the argument of counsel is on whether the restrictive or broad view of *BMC* and *Centillion* should govern, but what really is going on in the case.

**THE COURT:**  Sometimes in a 12(b)(6) motion we have to resolve legal standards in order to judge whether a plausible claim has been made.  Because it may be that discovery is not going to make any difference.

**MR. RITCHESON:**  I understand completely, but under the broad reading of these cases that I have championed here,

there absolutely is a plausible claim.

What you're being asked to do is not decide whether that claim is plausible under the broad reading.  You're being asked to do two things.  You're being asked to adopt a restrictive reading and to make a ruling on the merits of a relationship that we know nothing about, and neither one of those are consistent with a case law or rules governing 12(b)(6).

**THE COURT:**  Let me ask you about the other direct infringement claim which I think you are making, which is a non-vicarious claim; that is somehow the claim can be construed to show that even without the consumer involvement, that Sling is liable.

Does that mean that you are arguing that "third control device" can mean software alone without hardware?

**MR. RITCHESON:**  No, your Honor.  It means something a little more complicated.  And I will tell you that this is an area -- and I wouldn't mislead the Court on this -- that I think does need additional analysis from our perspective, that is this; that the consumer is not part of the claim.

What's required is, just focusing on one of the claims for the 130, it does have this concept of three control devices, but it's not a control device necessarily that is deployed by the end user; that is, the third control device being remotely located from the second control device, being remotely located from the first control device, which we know is at the

premises.

It is likely, if not more than possible, that the second and third control devices are actually within the network architecture of Sling.  There is nothing that precludes there being a fourth control device that controls each of those three.  What we're saying is we need at least three.  And the network architecture is not something that is very widely known publicly with respect to Sling.

We are engaged in discussing with consultants and experts who have worked on that that aren't under conditions of confidentiality what that architecture looks like, but there is no reason to believe that the second and third control devices are not actually resident within the network itself of Sling.

**THE COURT:**  That's not what you've alleged in the complaint the way it's described.  It's a whole new theory, a whole new description.

**MR. RITCHESON:**  As I've said, I think the complaint is not something that can go unamended.  I think it's something that needs to be amended.

I'm not pleased, as I said, with the indirect infringement.  I'm not pleased with the direct either.  What I know is this solution sold by Sling infringes these patents and at least two others in our client's portfolio and those issues have not been properly addressed before this Court and needs to be resolved now, in my opinion.

The solution here with respect to the other two -- what I will ask, and as I think Ms. Krevans did anticipate me, I do think it should be amended.  I think it should be amended for a number of reasons.  There are, as I said, two other video streaming patents that I do think Sling needs to be aware of.

I think that the issue of indirect infringement needs to be pled with particularity.  I think there needs to be a -- a greater clarification of the claim of direct infringement, and whether it includes components of the network system that reside within Sling's sole control.  And that's something that I think should be done promptly within the next 30 days.

THE COURT:  Considering this case has been pending since --

MR. RITCHESON:  Don't look at the year, your Honor. You will be misled.

THE COURT:  (Continuing) -- '10.

MR. RITCHESON:  The complaint was filed in Los Angeles in the Central District.

As a courtesy, the sparring with Ms. Krevans notwithstanding, I actually used to work for her firm.  When I was approached by them, we did do every courtesy, extend every courtesy, including transferring this up here and including some amendments.  Unfortunately, beyond anybody's control, the transfer took, I think, a year.

THE COURT:  It got transferred up here in April 2011,

is when Judge Carter signed the transfer order.

**MR. RITCHESON:**  Yeah.  I don't think it landed here forever.  I may be wrong, but I think it's 11 or 12 months before this thing popped up again.

So although it has an age stamp on it in terms of how mature this is, it truly is in its infancy.

**THE COURT:**  Well, then let me ask you.  What they are asking for is essentially a third amended complaint to reclarify or recast its direct infringement contentions and to now allege an indirect infringement, contributory and inducement claim.

**MS. KREVANS:**  The ones that they had in their first claim, in their original --

**MR. RITCHESON:**  And to add patents, your Honor.

**MS. KREVANS:**  (Continuing) -- in their original complaint, your Honor, which they didn't plead properly and when we originally contacted them to meet-and-confer about the motion to dismiss that we intended to file on their very first complaint, they said:  We will drop those.  We agree they are not proper.  They dropped their indirect infringement claims. That was three complaints ago.

I don't know if your Honor has children.  You've ever been to one of those children's arcades places where they have this game called Whack-a-Mole.  That's what this really is more and more strongly reminding me of.

**MR. RITCHESON:**  She stole my analogy, your Honor.

**MS. KREVANS:**  It doesn't seem to matter what they put in their complaint --

**THE COURT:**  Hit it right on the head, so to speak.

**MS. KREVANS:**  When they put something in whatever is their latest complaint and we point out to the Court that it's legally insufficient on its face, even accepting everything as true, they then say so, "Oh, but that's not what we really meant and we would like to plead again."  And now they want to plead again something that they dropped in their very original complaint.

So I think at some point, and I think that point was reached when they filed this complaint, the Court has given them enough chances to replead.  We had a very specific discussion the last time we were here, although there was a different attorney for the plaintiff.  That's certainly correct.  We had a very specific discussion about the deficiencies of the previous complaint, the theory that they had put in their brief, that they said they wanted to plead. We explained why we said that pleading that theory would be futile under *Centillion*.  They said they wanted to try.

In fact, if you go back and look at the transcript, which I did last night, they said:  We're going to come and explain to your Honor why the law of *Centillion* is wrong, or if there is something different about it that should be applied

differently here.

That's not what they did in their opposition here.  In their opposition brief instead they said:  First, oh, you have to consider the claims to do this and that would be wrong.  That's clearly not true because we're just using their complaint and what they say are the devices.

Then they say:  But, really, we have all these other infringement theories, which are in the complaint.  As your Honor correctly pointed out, they are not.

Now, we hear from Mr. Ritcheson that he, too, agrees that the complaint is insufficient and he has yet some new and different theory that he would like permission to plead at some point, and this is the point.

If your complaint is dismissed with leave to amend so that you can try to plead correctly as it was last time, you have to actually plead something that states a claim on which relief can be granted.  They haven't done that.  Mr. Ritcheson has conceded that they haven't done that.  I don't think there is a broader construction of *Centillion* that we could do.

**THE COURT:**  With respect to the indirect infringement claim, there is not a direct -- obviously, a denominated claim as such.  It is included, I think you pointed out, in -- at the end of the prayer.

**MS. KREVANS:**  It's in the prayer for relief, along with every other cat and dog, but it is absolutely not pled.

They explicitly plead direct infringement by Sling and vicarious liability by Sling for supposed direct infringement by customers.

THE COURT:  So with respect to the normal, we're almost forecasting a Rule 15 analysis here, a request to file a further amended complaint.

If I were to grant your motion, what's the prejudice to you besides the burden of having to respond yet to another complaint?  What litigation disadvantage or reliance or anything else has befallen upon your client if I were to allow, for instance, an indirect claim and perhaps without a mens rea. Their strongest case for mens rea, I will say right now, seems to me, unless they have got something new, is the post complaint period.

MR. RITCHESON:  That's exactly right, your Honor. That's what we were focusing on.

THE COURT:  So what's the litigation disadvantage slash prejudice under Rule 15 analysis that you would claim?

MS. KREVANS:  Well, first of all, I don't think they have any way to state a claim for that either, and I don't think at a certain point the Court should entertain them simply amending, amending, amending and dismissing with leave to amend.  I think -- that was supposed to stop this time and so I think this should be the end.

And I would say, although I have to say I -- I, in

general, don't believe in asking Courts for sanctions because it just always feels like a beyond adversarial thing to do, but if the Court actually did let the plaintiff amend again, I think at the very least we should get our fees for the previous several rounds because what we have really heard today from Mr. Ritcheson is we've gone through all these rounds because, in fact, they didn't do the right analysis.  If he truly could plead a correct inducement allegation, then they should have done that the first time when we pointed out to them that though they said inducement, they didn't plead it correctly.

And one thing for sure is that we have spent a bunch of money on defending against theories that they clearly keep abandoning.  They are going to have to abandon this one, too, because there is no broader reading of *Centillion*.  And, frankly, I think at some point it really just does have to stop.

This is not a pro se.  I was sitting in the back just with my heart bleeding for that poor gentleman who was here who doesn't know how to get his car out.  I bet when he goes back it's more than $3,000 now, but that man is pro se.  This plaintiff is not pro se.

THE COURT:  Maybe your firm can do some pro bono work.

MS. KREVANS:  Well, I was going to suggest he talk to the City's Office on Homeless People because I think they

probably could help him.

But this is behavior that at some point has to be cut off.

THE COURT:  Let me ask you, Mr. Ritcheson, why was the indirect infringement claim relinquished, abandoned and now raised?  What's the reason?

MR. RITCHESON:  Your Honor, it wasn't relinquished certainly.  As a courtesy to Mr. Moore, who is an attorney at Morrison and Foerster down in Los Angeles, I extended him two courtesies.

And to the extent that Ms. Krevans was able to overcome her shyness and ask for sanctions, I'd like to point out that we didn't require them to jump through the hoop of moving to transfer, even though Judge Carter didn't want this case transferred, and we --

THE COURT:  What does that have to do with dropping the claim?

MR. RITCHESON:  Well, we also extended another courtesy, which is when we began discussing resolution with Mr. Moore, he raised the issue of indirect infringement and we agreed, as a courtesy, to set the pleadings up here that we would remove indirect infringement and focus on direct with the understanding that there would be this spirit of -- more of cooperation and exchange of information.

In fact, the parties executed what we call a Super 408 agreement, which is a confidentiality agreement that would

allow the parties to discuss settlement and exchange confidential information.  We never got that confidential information.  We were never able to obtain that information to allow us to focus more clearly on the direct infringement.

And perhaps this is a cautionary tale for me, your Honor, that time spent at a firm doesn't necessarily make you good friends.  At this point we did extend those courtesies.  I frankly don't regret having extended them, but we do need to correct them and play the ball as it lies here.

**THE COURT:**  Here is the problem.  Whatever reason you did it with the expectation of some other courtesy, it also is an infringement on judicial resources to plead one thing, relinquish something else and then as you're about to run into rough waters on one claim say, "By the way, we didn't mean to relinquish.  We want to put it back and now reassert this."

There is a cost.  There is a judicial cost to this.  There is a public cost.  And the whole idea, as you know, of our local rules is to stop the shifting sands type of litigation.  This is shifting sands.

**MR. RITCHESON:**  Your Honor, I would couch it slightly differently.  I understand your feelings on this because I've felt the same in litigation.  I have been on the other side as well and felt this.

This was not a shifting sands.  This was an attempt to find a resolution with colleagues.  That did not work out.

That ultimately -- there have been no judicial resources consumed, to my knowledge, with respect to indirect infringement because we took it out.

The only time and resources that have been consumed, as far as I know, have been in the last 15 or 20 minutes in our discussions about them, and for that I apologize.

But I do think in representing my client I need to point out that I do not agree that that -- that that claim should stay out of this case.

I do believe that Sling absolutely is infringing these patents.  I do believe they are infringing two other patents in the portfolio.  And I think to preserve judicial resources, rather than require us to file a separate lawsuit with respect to those two patents, that we simply engage the process here and come to the fair result.

THE COURT:  Why weren't those other two patents named in the complaint?  What new information do you have that you didn't have then?

MR. RITCHESON:  Well, your Honor, it has more to do with our evaluating it with our consultants, the use of consultants in this case.

We had 21 defendants.  This was before the American Events Act.  We had 21 defendants down in Los Angeles.  We have now settled with all but one of them.

Our resources were -- I will tell you, were strained so

that we were able to focus on those cases that were active and not on this particular case, which did, through no fault of our own, go dormant for a year.

But now that Sling is only the -- there is only two defendants left of the originally named 21, we are focused on this.  It is early in the case.  There is no prejudice to Sling.  And, frankly, for fairness, these issues should be teed up and resolved in one proceedings.

**THE COURT:**  Let me --

**MS. KREVANS:**  May I?

**THE COURT:**  Yes, shortly.

**MS. KREVANS:**  Yes.

First, I have to defend my partner, Mr. Moore.  He never made any promise that there would be anything done in conjunction with the filing of a first amended complaint.

All that happened was we contacted -- under the rules in L.A., we contacted the plaintiff and said:  We think your complaint is deficient.  We are going to move to dismiss it.  And they said:  You don't need to move.  We agree that we will amend it to be more specific.  There was nothing beyond that.

We didn't make any bargain about what they would or wouldn't do in their amendment or what they would or wouldn't do and what we wouldn't do in response.

Second, I don't think that there is an issue of fairness in dismissing a complaint with prejudice when it is the third

time around.  And the Court has already given multiple opportunities for amendment and they have been badly used, shall we say.

MR. RITCHESON:  Your Honor, if I could make one final point?  On Page 3 of the parties' First Amended Joint Case Management Statement and Rule 26(f) report at Lines 17 through 19 defendant's position seemed to contemplate that amendment would be allowed.

To suggest that this was always the end of the road and there was no anticipation of amendment is simply rewriting history.

From 18 to 19 it reads in part:

"If this motion is granted, plaintiff will be forced to drop its claims or amend its complaint."

So clearly the concept of amendment was within the -- was within the mind of Sling at the time.  The current position that there should not be leave to amend is just inconsistent.

THE COURT:  All right.  Well, now that you're on the CMC, let me ask you this question.

Settlement and A.D.R., the parties have chosen Early Neutral Evaluation and parties have requested that they complete the selected A.D.R. process within 180 days.

I'm not sure what that means.  Complete the A.D.R. process or selection process?

**MR. RITCHESON:**  Your Honor, I think -- and you may know better than I.  I don't think that's the selection I think that's the completion of A.D.R.  I can't imagine --

**THE COURT:**  Page 7.

**MS. KREVANS:**  I think, your Honor, when we said select the A.D.R. Process, we mean the ENE process.

So we've picked ENE and what we're proposing is that the ENE should be completed within 150 days.  So that's from whenever the Court issues its order on the CMC, assuming that the complaint is not dismissed.

**THE COURT:**  All right.  I'm going to take the matter under submission as well as the now request to -- I think what I have to decide is will I entertain a motion to amend if I am to dismiss and will require you to make a Rule 15 showing by motion if I do go that route.

And so I'm not going to set a trial date or any of that.  I've got to see where we're at first.  But I am going to get the process going.  In case I do retain some jurisdiction in this case, to get this into A.D.R.  I don't see a down side to starting that process and imposing a time limit with respect to that.

So what I will do is take the matter under submission.  We should schedule a further status conference just as a control date, but depending on what happens, I may have you come in, you know, earlier or later or, you know, if I decide to dismiss

without leave to amend, then you'll know what to do, I suppose.

So why don't we set a control date for four months out, Betty?

THE CLERK:  December 12 at 10:30, your Honor.

MR. RITCHESON:  How about 12/12 12:00?

THE CLERK:  I'm sorry, December 14th.

THE COURT:  Too bad.

MR. RITCHESON:  Can we get the 12th?  I will be here 12/12.

THE COURT:  Do it at noon, right?

THE CLERK:  December 14, 10:30.

THE COURT:  ADR and ENE to be completed within 150 days.  Do you need a full 150 days?

MR. RITCHESON:  No, your Honor.  I don't believe that -- I can't imagine needing that long.

MS. KREVANS:  I don't think we need that long, your Honor.  I would welcome a shorter time period.

THE COURT:  How about 90 days?

MR. RITCHESON:  What would that put us at?

THE CLERK:  October.

MR. RITCHESON:  Ninety days is fine with us, your Honor.

MS. KREVANS:  Ninety days is absolutely fine with us, your Honor.

THE COURT:  Okay, good.

Okay.  Then I will take it under submission.  I appreciate the argument.

THE CLERK:  Ninety days.  You want them to come back earlier?

THE COURT:  No.  I will let them do the 90 days and have them come back right after that.  So that will work.

THE CLERK:  Okay.

THE COURT:  I think we're clearly dealing with an area of law that either way is not particularly crystal clear and looks like the Federal Circuit may provide under the circumstances more guidance in some of its en banc decisions.

MS. KREVANS:  December 14 is a Saturday -- oh, no that's -- wait.

THE COURT:  December 14.

THE CLERK:  It's Friday.

THE COURT:  I take it at this point no ongoing discovery.

MS. KREVANS:  Your Honor ordered that nothing like that start until you --

THE COURT:  Until this pleading gets in place.

MR. RITCHESON:  Your Honor, I apologize.  As I said, I got reengaged in this process recently.  We did send discovery outlast night.

THE COURT:  So you can disregard that.

MS. KREVANS:  Thank you, your Honor.

THE COURT:  Thank you, appreciate it.

(Proceedings adjourned.)

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter -  U.S. District Court - San Francisco, California*
*(415) 431-1477*

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/s/ Debra L. Pas

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Friday, July 6, 2012